The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
April 11, 2019

**2019COA53**

**No. 18CA0498, *Yeutter v. ICAO* — Labor and Industry — Workers' Compensation — Benefits — Permanent Partial Disability — Medical Impairment Benefits — Permanent Total Disability — Maintenance Medical Benefits — Division-Sponsored Independent Medical Examination**

A division of the court of appeals considers whether section 8-42-107(8)(b)(III), C.R.S. 2018, which provides that a division-sponsored independent medical examination (DIME) physician's opinions concerning maximum medical improvement and impairment are given presumptive weight, also requires deference to a DIME physician's opinion as to causation. The division concludes that no such deference is due under the statute and that the question of causation should be reviewed de novo.

Court of Appeals No. 18CA0498
Industrial Claim Appeals Office of the State of Colorado
WC No. 489-594-003

Joseph Yeutter,

Petitioner,

v.

Industrial Claim Appeals Office of the State of Colorado; CBW Automation, Inc.;
and Pinnacol Assurance,

Respondents.

ORDER AFFIRMED

Division V
Opinion by JUDGE GROVE
Terry and J. Jones, JJ., concur

Announced April 11, 2019

Eley Law Firm, LLC, Scott Eley, Denver, Colorado, for Petitioner

No Appearance for Respondent Industrial Claim Appeals Office

Harvey D. Flewelling, Denver, Colorado, for Respondents Pinnacol Assurance
and CBW Automation, Inc.

¶ 1    Claimant, Joseph Yeutter, seeks review of a final order of the Industrial Claim Appeals Office (Panel) affirming the decision of an administrative law judge (ALJ) denying and dismissing his claims for permanent total disability (PTD) and maintenance medical benefits.  We affirm.

## I.  Background

¶ 2    Claimant worked as a controls engineer for employer, CBW Automation, Inc.  In August 2012, he sustained admitted, serious injuries in a work-related accident when he was struck in the head and shoulder and knocked to the ground by a robotic arm.  His injuries included "a skull fracture, vestibular ear and inner ear nerve damage, slap tear in [the] shoulder, broken arm," and fractures to "both of his orbital sockets."  He returned to work after two weeks but voluntarily resigned two months later; he then commenced employment as a mechanical engineer for BW Container Systems, a position he held until February 2015.  At BW Container, he typically worked nine or ten hours per day "with weekends and sometimes evenings after work."

¶ 3    More than a year after the incident, claimant's physical injuries had "stopped hurting so much," but he felt fatigued.  In

1

July 2014, one of his authorized treating physicians, Dr. Carol Newlin, prescribed Adderall and Ritalin as stimulants to help him "get through [his] day." A sleep study conducted one month later by another treating physician, Dr. Mark Neagle, revealed sleep patterns consistent with narcolepsy. A professor of psychiatry at the University of Colorado, Dr. Martin Reite, corroborated the narcolepsy diagnosis, stating that "as a result of my evaluation I have concluded that [claimant] has a sleep disorder consisting of Type 1 Narcolepsy, most likely post-traumatic in origin." Dr. Reite went on to note that "the cause of narcolepsy is varied, can be idiopathic (onset with no obvious cause), familial (genetic influence and running in families), or triggered by viral infection or head trauma (as in [claimant's] case)." Finally, Dr. Reite opined that claimant "is seriously disabled as a result of his narcolepsy and other trauma related conditions, and his prognosis at this time is guarded."

¶ 4    On August 26, 2015, claimant was placed at maximum medical improvement (MMI) by his primary authorized treating physician, Dr. Kevin O'Toole. Although claimant's skull and facial fractures had healed, Dr. O'Toole assessed claimant as suffering

from "narcolepsy, hypersomnolence, probably related to traumatic brain injury, managed with stimulant medication." He recommended that claimant "continue his current medications." Dr. O'Toole also opined that claimant could not work and should be off work indefinitely. He rated claimant's permanent impairment at 67% of the whole person, which he calculated by combining impairment ratings for claimant's mental health, sleep and arousal disorders, and vision impairment.

¶ 5  Three mental health and medical experts retained by employer disagreed with Dr. O'Toole's assessment, however. Psychiatrist Dr. Susan Rosenfeld opined that the "reported symptoms, clinical findings and treatment plan do not support functional impairment from a psychiatric condition which translates into restrictions or limitations."

¶ 6  Similarly, Dr. Stephen Selkirk, who is board certified in both psychiatry and neurology, reported that claimant

> has extensive subjective complaints that are not supported by objective data in the medical record. . . . The complaint of cognitive dysfunction has not been confirmed by a formal neuropsychological battery. Finally, the report of fatigue is subjective. The result of sleep study evaluations and multiple sleep

latency tests are not available for review and therefore the presence of narcolepsy or post-traumatic narcolepsy cannot be objectively confirmed.

Based on his review of the medical records, Dr. Selkirk concluded that claimant had "no impairments from a neurological perspective, and thus, no restrictions or limitations are supported."

¶ 7     Finally, Dr. Kathleen D'Angelo, who specializes in occupational medicine, independently examined claimant and conducted a thorough medical records review.  She expressly noted that a second sleep study confirmed claimant's narcolepsy diagnosis, but she was skeptical that it was work-related because available medical literature had not demonstrated a causative connection between head trauma and narcolepsy.  To further support her conclusion that claimant's narcolepsy was not related to his work injury, she explained that the lengthy temporal gap between claimant's injury and the onset of his narcolepsy substantially lessened the likelihood of a causal connection between the two.

¶ 8     After employer obtained these independent medical examination reports, claimant underwent a division-sponsored independent medical examination (DIME) with Dr. Albert Hattem.

Dr. Hattem agreed with Dr. O'Toole that claimant reached MMI on August 26, 2015. But, he assigned claimant a lower impairment rating — 39% of the whole person — than Dr. O'Toole had assigned because he felt the brain impairment calculated by Dr. O'Toole was too high given that claimant "does not require assistance with activities of daily living." Dr. Hattem was less certain about the cause of claimant's narcolepsy, though, and deferred to claimant's treating physicians on the question. He stated as follows:

> This is a very difficult case in terms of causation because the examinee's condition (post traumatic narcolepsy) is very rare and did not become evident until more than one year after the August 24, 2012 injury. After the injury and prior to first reporting fatigue in November 2013 the examinee had been working full duty as an engineer for two different employers sequentially – work that would be considered very cognitively demanding. . . .
>
> Because I have no prior experience with this type of condition, I must defer to all of the specialists who previously evaluated [claimant]. . . . All of these physicians opined that the examinee's narcolepsy is related to the August 2012 work injury despite the latency between the injury and the onset of this disorder.

¶ 9 Employer did not contest Dr. Hattem's DIME opinions. Rather, it filed a final admission of liability (FAL) accepting Dr. Hattem's MMI date of August 26, 2015, and admitting claimant's entitlement to permanent partial disability (PPD) benefits based on the 39% whole person impairment rating, which it calculated to equal $127,502.69. However, employer did not admit liability for any continuing post-MMI maintenance medical benefits.

¶ 10 Thereafter, claimant filed an application for a hearing seeking PTD benefits and future maintenance medical benefits.

¶ 11 At the ensuing hearings, the parties offered contradictory evidence of claimant's need for PTD benefits. Katie Montoya, a vocational consultant, testified on claimant's behalf. She opined that although claimant had no work restrictions "from a physical standpoint," she agreed with Dr. O'Toole's opinion that claimant's issues with "wakefulness, the capacity to be productive day in and day out and what would be necessary pharmacologically" for him to maintain employment, made him incapable "of returning to work at this time."

¶ 12 In contrast, employer's retained vocational rehabilitation counselor, Roger Ryan, opined that claimant "is able to work and

earn a wage." Mr. Ryan cited to claimant's computer adeptness, mechanical engineering experience, and military background as transferable skills upon which claimant could draw to find gainful employment. Mr. Ryan identified several occupations matching claimant's abilities, including mechanical drafter, information clerk, salesperson, cashier, telephone solicitor, tutor, appointment clerk, dispatcher, night auditor, collection clerk, unarmed security guard, and production assembler.

¶ 13 Employer also introduced the opinions of two additional independent medical examiners to support its position that claimant was neither permanently totally disabled nor required ongoing maintenance medical care. These independent medical examiners, psychiatrist Dr. Robert Kleinman and psychologist Dr. Susan Kenneally, both questioned the necessity of claimant receiving PTD and maintenance medical benefits. Dr. Kleinman, in particular, doubted the severity of claimant's narcolepsy, and suggested that claimant was exaggerating the extent of his disability. He also opined that claimant "does not have restrictions or limitation" that would impede his ability to work.

¶ 14    Dr. Kenneally, in turn, questioned the causal connection between claimant's admitted work-related injury and his accurately diagnosed narcolepsy.  She testified that there is a dearth of medical research linking narcolepsy and traumatic brain injury (TBI), noting that there is a lack of "reliable, repeatable markers for narcolepsy, and we certainly have no way to discriminate if it is caused by traumatic brain injury, it is caused by genetic history, it is caused by other trauma."  In addition to "the science [being] out" on this question, she explained that the "late onset" of claimant's narcoleptic condition made it "highly atypical and would argue against it being caused by or related to the TBI."  Moreover, the battery of tests Dr. Kenneally administered to claimant revealed that although he "clearly" suffered a TBI as a result of his workplace accident, "current testing found no pattern of persistent deficits consistent with the brain injury findings at the time of the injury."

¶ 15    After two days of hearings, and the admission of hundreds of pages of medical records, the ALJ found that claimant failed to demonstrate that it was "more probably true than not that his narcolepsy was caused by his August 24, 2012 industrial accident while working for [e]mployer."  The ALJ was persuaded by Dr.

8

D'Angelo's testimony that "[b]ecause traumatic brain injuries are acutely symptomatic, the delayed onset of [c]laimant's narcolepsy symptoms suggests an attenuated causal relationship between his accident and the development of narcolepsy." The ALJ also found that the "bulk of the medical evidence supports Mr. Ryan's determination that [c]laimant has the ability to earn wages in some capacity." Accordingly, the ALJ denied and dismissed claimant's claims for PTD and maintenance medical benefits. A divided Panel affirmed the ALJ's order. The majority rejected claimant's contention that the ALJ was bound by the DIME's conclusion that claimant's narcolepsy was related to the work accident. The Panel noted that neither MMI nor impairment was at issue before the ALJ. Thus, the Panel held, the DIME physician's causation determination held no presumptive weight and claimant bore the burden of proving his entitlement to PTD benefits by a preponderance of the evidence. Similarly, the DIME physician's opinion that claimant would require maintenance medical treatment did not relieve claimant of the burden to prove the reasonableness, necessity, and relatedness of the requested continuing treatment. Because substantial evidence supported the

9

ALJ's factual findings on these issues, *see* § 8-43-301(8), C.R.S. 2018, the Panel found "no basis to disturb the order." Claimant now appeals.

## II. ALJ Was Not Bound by the DIME's Causation Analysis

¶ 16     Claimant first contends that the ALJ erred in requiring him to prove his entitlement to PTD benefits and maintenance medical benefits by a preponderance of the evidence. He asserts that the ALJ should have given Dr. Hattem's DIME opinion presumptive weight as to the cause of his injury and that employer should have been required to overcome the DIME's causation opinion with clear and convincing evidence. We disagree.

### A. Standard of Review

¶ 17     Because the question claimant raises involves the application of the governing law and construction of statutes, we review it de novo. *See City of Littleton v. Indus. Claim Appeals Office*, 2016 CO 25, ¶ 27 ("We review de novo questions of law concerning the application and construction of statutes." (quoting *Hickerson v. Vessels*, 2014 CO 2, ¶ 10)).

## B. Analysis

¶ 18    A DIME physician's opinions concerning MMI and impairment are, by express statutory edict, afforded presumptive weight. *See* § 8-42-107(8)(b)(III), C.R.S. 2018. The statute states that "[t]he finding regarding [MMI] and permanent medical impairment of an independent medical examiner in a dispute arising under subparagraph (II) of this paragraph (b) may be overcome only by clear and convincing evidence." *Id.* Subparagraph (II) is limited to parties' disputes over "a determination by an authorized treating physician on the question of whether the injured worker has or has not reached [MMI]." § 8-42-107(8)(b)(II). Nowhere in the statute is a DIME's opinion as to the cause of a claimant's injury similarly imbued with presumptive weight.

¶ 19    The claims claimant asserted in this case involved neither MMI nor permanent impairment — those issues had already been conceded by employer in its FAL. Rather, claimant sought PTD benefits and maintenance medical benefits in his application for hearing. He bore the burden of establishing his entitlement to these benefits because a claimant "shall have the burden of proving

entitlement to benefits by a preponderance of the evidence."
§ 8-43-201(1), C.R.S. 2018.

¶ 20    Claimant attempts to circumvent this statutory structure by arguing, essentially, that a DIME's opinion on causation also carries presumptive weight.  He cites to *Leprino Foods Co. v. Industrial Claim Appeals Office*, 134 P.3d 475 (Colo. App. 2005), and *Cordova v. Industrial Claim Appeals Office*, 55 P.3d 186 (Colo. App. 2002), as well as several Panel decisions and the opinion of the dissenting Panel member in this case, to support his contention.  He asserts that, from these cases, a general principle can now be extracted that — like MMI and impairment — a DIME's causation opinion universally carries presumptive weight.  He characterizes as "exceptions" cases that limit a DIME opinion's presumptive weight to MMI and impairment.

¶ 21    Notwithstanding claimant's characterization, the principle that a DIME's opinion carries presumptive weight only with respect to MMI and impairment, but not as to causation, is not an "exception." It is the statutory rule.  *See* § 8-42-107(8)(b)(III); *Faulkner v. Indus. Claim Appeals Office*, 12 P.3d 844, 846 (Colo. App. 2000) (DIME opinion concerning causation need not be overcome by clear and

12

convincing evidence where dispute involved the "threshold requirement" that the claimant establish a compensable injury); *Story v. Indus. Claim Appeals Office*, 910 P.2d 80, 81 (Colo. App. 1995) (DIME determination of MMI did not preclude change of physician order where claimant is entitled to post-MMI treatment).

¶ 22    The cases claimant cites do not convince us otherwise.  First, although we defer to the Panel's interpretation of the Act, *see Keel v. Indus. Claim Appeals Office*, 2016 COA 8, ¶ 31, "we are not bound by the Panel's decisions in other workers' compensation cases," *Olivas-Soto v. Indus. Claim Appeals Office*, 143 P.3d 1178, 1180 (Colo. App. 2006).  Nor do we give precedential weight to unpublished decisions of other divisions of this court.  *See Bittle v. Brunetti*, 750 P.2d 49, 52 n.2 (Colo. 1988).  And, the published opinions of other divisions of this court on which claimant relies do not support the position he advances.  Indeed, as the Panel majority noted, "[w]hen . . . a party is not challenging a DIME physician's MMI determination or impairment rating, the Courts have repeatedly held that the heightened burden of proof required by § 8-42-107(8) does not apply."

¶ 23     For example, in *Leprino Foods*, the division held that the DIME's causation opinion carried presumptive weight because it was inextricably tied to MMI. There, the employer was seeking "to avoid the finality of the DIME physician's opinion regarding MMI." 134 P.3d at 482. The division noted that MMI and/or impairment are often inextricably linked to causation because "[b]oth determinations inherently require the DIME physician to assess, as a matter of diagnosis, whether the various components of the claimant's medical condition are causally related to the industrial injury." *Id.* This is true because no claimant achieves MMI until all conditions related to the workplace injury have reached their maximum improvement. *See Paint Connection Plus v. Indus. Claim Appeals Office*, 240 P.3d 429, 433 (Colo. App. 2010) ("[T]he legally significant date, that is, the date of MMI for purposes of ending a claimant's temporary disability, is the date upon which the claimant has attained maximum medical recovery from all of the injuries sustained in a particular compensable accident. . . . MMI is not 'divisible and cannot be parceled out among the various components of a multi-faceted industrial injury.'" (quoting *Parra v.*

*Haake Farms*, W.C. No. 4-396-744, 2001 WL 470646, at *2 (Colo. I.C.A.O. Mar. 8, 2001))).

¶ 24     Moreover, *Leprino Foods* explicitly recognized that although "a DIME physician's opinions concerning MMI and permanent medical impairment are given presumptive effect," in contrast, "the threshold question of whether the claimant has sustained a compensable injury in the first instance is one of fact that the ALJ must determine, if contested, under the preponderance of the evidence standard." 134 P.3d at 482-83. Thus, *Leprino Foods* does not stand for the proposition that a DIME's opinion on causation always carries presumptive weight.

¶ 25     Similarly, *Cordova* declined to extend any presumptive weight to a DIME's opinion beyond MMI and impairment. The division rejected the claimant's attempt to extend the DIME opinion's presumptive weight to worsened conditions. Instead, it reiterated the governing statutory standard:

> Claimant attempts to characterize the present dispute as one involving MMI. However, the pertinent and necessary inquiry is whether he has suffered a deterioration in his condition that justifies additional benefits. Although medical evidence bearing on whether he has remained at MMI would be relevant to that

15

> inquiry, the original MMI determination may not be questioned. We therefore agree with the Panel that the opinion of a DIME physician as to whether a claimant's condition has worsened carries no special weight and need not be overcome by clear and convincing evidence. . . .
>
> The Panel correctly observed that the opinions of a DIME physician have only been given presumptive effect when expressly required by the statute.

*Cordova*, 55 P.3d at 190 (citation omitted). Thus, like *Leprino Foods*, *Cordova* does not stand for the proposition claimant advances.

¶ 26    Here, the only issues before the ALJ were PTD and maintenance medical benefits. Neither of these inquiries required examination of the DIME physician's MMI or impairment determinations. A claimant is permanently and totally disabled, and therefore entitled to PTD compensation, if he or she "is unable to earn any wages in the same or other employment." § 8-40-201(16.5)(a), C.R.S. 2018. In determining whether a claimant is permanently and totally disabled, the ALJ may consider "human factors." *See Weld Cty. Sch. Dist. RE-12 v. Bymer*, 955 P.2d 550, 556 (Colo. 1998). "Human factors" include such elements as

the claimant's "education, ability, and former employment," *Holly Nursing Care Ctr. v. Indus. Claim Appeals Office*, 992 P.2d 701, 703 (Colo. App. 1999); "the claimant's age, work history, general physical condition, and prior training and experience," *Joslins Dry Goods Co. v. Indus. Claim Appeals Office*, 21 P.3d 866, 868 (Colo. App. 2001); and "the community where [the] claimant resides," *Brush Greenhouse Partners v. Godinez*, 942 P.2d 1278, 1279 (Colo. App. 1996), *aff'd sub nom. Bymer*, 955 P.2d 550. None of these factors bear on whether a claimant has reached MMI.

¶ 27 Likewise, a claimant is entitled to post-MMI maintenance medical benefits if he or she shows that future medical treatment will be "reasonably necessary to relieve the claimant from the effects of the industrial injury or occupational disease even though such treatment will not be received until sometime subsequent to the award of permanent disability." *Grover v. Indus. Comm'n*, 759 P.2d 705, 710 (Colo. 1988). An employer, in turn, "may contest any future claims for medical treatment on the basis that such treatment is unrelated to the industrial injury or occupational disease." *Id.* at 712. As with PTD, this analysis does not necessitate inquiry into MMI or impairment.

¶ 28    Because section 8-42-107(8) only grants presumptive weight to a DIME's opinions concerning MMI and impairment, *see Faulkner*, 12 P.3d at 846, we decline to extend the statute's presumptive reach to causation. *See Kraus v. Artcraft Sign Co.*, 710 P.2d 480, 482 (Colo. 1985) (The appellate courts of this state have "uniformly held that a court should not read nonexistent provisions into the . . . Act."); *see also Kieckhafer v. Indus. Claim Appeals Office*, 2012 COA 124, ¶ 16. Accordingly, the ALJ was not bound by Dr. Hattem's causation determination and committed no error when he denied and dismissed claimant's claims for PTD and maintenance medical benefits.

## III. No Due Process Violation

¶ 29    Claimant also asserts that he was deprived of his property rights without due process. He contends that by requiring him to "apply for further permanency and medical benefits," employer was able to "avoid" the burden of overcoming the DIME's opinion by clear and convincing evidence, and instead improperly shifted the burden to him "to prove the cause of his narcolepsy without the presumptive effect from Dr. Hattem's DIME opinion." We are not persuaded claimant suffered any constitutional deprivation.

18

¶ 30    As we set forth above, claimant's request for PTD and maintenance medical benefits raised issues separate and apart from MMI and impairment, the two areas in which a DIME opinion is granted presumptive weight. *See* § 8-42-107(8). No improper burden shifting occurred here because, under the Act, claimant bears the burden of proving his entitlement to these benefits. *See* § 8-43-201.

¶ 31    Regardless, we perceive no due process violation here. To establish a due process claim, a claimant must demonstrate that he or she has been deprived of a protected right to liberty or property without due process of law.

> The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in "property" or "liberty." It is necessary to consider whether a property right has been identified, whether government action with respect to that property right amounted to a deprivation, and whether the deprivation, if one is found, occurred without due process of law.

*Whatley v. Summit Cty. Bd. of Cty. Comm'rs*, 77 P.3d 793, 798 (Colo. App. 2003) (citation omitted). "A protected interest in property exists when a person has a legitimate claim of entitlement to the property." *Id.*

19

¶ 32    Here, employer did not admit that claimant was entitled to PTD and maintenance medical benefits and the ALJ did not award them.  Because no order entitled claimant to these benefits (and no statutory provisions applied), he had no protected property interest in them.

¶ 33    To the extent claimant implies that the ALJ's order finding no causal link between his work injury and his narcolepsy deprived him of receiving any benefits, the record suggests otherwise.  Employer filed a FAL *admitting* to Dr. Hattem's MMI date and permanent impairment rating and calculating the PPD benefits to which claimant was entitled.  Nothing in the ALJ's order limited or even addressed claimant's PPD award, and, as we review the record, claimant should receive it.

¶ 34    Nor can claimant establish the inadequacy of the process provided him.  Due process does not guarantee that claimants will always receive the benefits they request.  Rather, due process ensures that those benefits — once admitted to or awarded — will not be taken away without "notice and the opportunity to be heard by an impartial tribunal."  *Wecker v. TBL Excavating, Inc.*, 908 P.2d 1186, 1188 (Colo. App. 1995).  Because claimant had two hearings

on his request for PTD and maintenance medical benefits — at which he testified, presented witnesses on his behalf, and introduced hundreds of pages of documentary evidence in support of his claim — we cannot say that he was denied an opportunity to be heard.

¶ 35 Accordingly, we conclude claimant was not deprived of his right to due process. *See Whatley*, 77 P.3d at 798; *Wecker*, 908 P.2d at 1188.

## IV. Conclusion

¶ 36 The order is affirmed.

JUDGE TERRY and JUDGE J. JONES concur.